```
1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,  :
4                                   CR-94-823 (S)

5        -against-              United States Courthouse

6                          :    Brooklyn, New York

7  LEMRICK NELSON,

8            Defendant.
                           :    August 20, 2003
9                               Four o'clock p.m.
- - - - - - - - - - - - - X
10            TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE FREDERIC BLOCK
11            UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:     ROSALYN M. MAUSKOPF
                           United States Attorney
14                         BY:  LAUREN RESNICK
                           CHRISTINA DUGGER
15                         ASSISTANT U.S. ATTORNEYS
                           Brooklyn, New York 11201
16
For the Defendant:     QUIJANO & ENNIS, P.C.
17                         432 Park Avenue - Suite 700
                           New York, New York 10016
18                         BY: PETER ENRIQUE QUIJANO, ESQ.

19
                           RICHARD JASPER, ESQ.
20                         276 Fifth Avenue
                           New York, NY  10001
21
                           MISCHEL, NEUMAN & HORN, P.C.
22                         One Whitehall Street-10th Floor
                           New York, New York   10004
23                         BY:JAMES NEUMAN, ESQ.

24

25  Court Reporter:        Marsha Diamond
                           225 Cadman Plaza East
```

1                         Brooklyn, New York
                          TEL: (718) 260-2489
2                         FAX: (718) 254-7242

3   Proceedings recorded by mechanical stenography, transcript
    produced by CAT.
4

5           THE CLERK:  Criminal cause for sentencing: United

6   States versus Lemrick Nelson.

7           Docket No. CR-94-823 (S)

8           Parties, state your appearance for the record.

9           MS. RESNICK:  Lauren Resnick, for the government?

10          MS. DUGGER:  Christina Dugger, for the government.

11          MS. RESNICK: Good afternoon.

12          MR. QUIJANO:  Peter Quijano for the defendant Lemrick

13  Nelson.

14          MR. JASPER: Richard Jasper.

15          MR. NEUMAN: James Neuman.

16          THE COURT:  I think it would be good if you came up

17  close here and Mr. Nelson can stand with you or he can be

18  seated, whatever is most comfortable for him.

19          Mr. Quijano, even though you are surrounded by able

20  counsel, I will direct my comments to you in the first

21  instance.  At any time any of your colleagues wish to address

22  the Court, just so indicate.

23          MR. QUIJANO:  Yes, Your Honor.

24          THE COURT:  Let's not have cross communication or

25  sudden interruptions.

```
 1          MR. QUIJANO:  I expect to be speaking for the Nelson

 2   defense team.

 3          THE COURT:  There are two fine attorneys for the

 4   government and I will direct my comments to you, Ms. Resnick.

 5   No disrespect to Ms. Dugger.  If she wants to comment at any

 6   time, you indicate.  There are no cross conversations.  Okay?

 7          MS. RESNICK:  Yes.

 8          THE COURT: Mr. Quijano, is your client prepared to be

 9   sentenced today?

10          MR. QUIJANO:  Yes, he is, Judge.

11          THE COURT:  Have you shared with him the most recent

12   presentence report, I should state the most updated, which is

13   dated June 17, 2003.

14          MR. QUIJANO:  We have and we have reviewed it with

15   him.

16          THE COURT:  The prior presentence report was rendered

17   back on April 18, 1997 so in tandem they constitute the

18   collective presentence report before the Court.

19          MR. QUIJANO:  That is our understanding also,

20   Your Honor.

21          THE COURT:  Can you give the Court an appropriate

22   level of comfort that your client understands what is in the

23   report and you have discussed it fully with him and he has had

24   a fully opportunity to understand its contents?

25          MR. QUIJANO:  We are fully competent.
```

1            THE COURT:  As is my customary practice, let me

2    identify what is in the presentencing file in addition to the

3    underlying presentence reports which I just referred to,

4    which, once again, for the record constitutes the original one

5    back on April 18th, 1997 as well as the updated one of this

6    past June 17th, 2003.  I have the following material that has

7    been submitted to me. Starting on June 15th, 2003 I have a

8    letter from the Bronx Judicial Community Relation Counsel --

9    everybody pay careful attention if there was anything that was

10   sent to me that didn't reach me.

11           MR. QUIJANO: Should we indicate we don't have a copy

12   of anything that the Court is referring to?

13           THE COURT:  Let me know.

14           MR. QUIJANO:  We don't have a copy of what the Court

15   just identified.

16           THE COURT: That is signed by Charles Landsberg.  You

17   note what else you haven't seen and then we will take a moment

18   or so to read these. I will give you a chance to read these.

19   We have next the submission by the government dated June 18th,

20   2003 with Exhibits A through E annexed thereto.  You have

21   received them?

22           MR. QUIJANO:  Yes, Your Honor, we have.

23           THE COURT:  Next I have a letter dated July 30th,

24   2003.  That's two pages in length.  It's a joint letter signed

25   on behalf of the American Jewish Congress, American Jewish

1   Committee, Anti Defamation League, Counsel for Jewish

2   Organizations, in City Service, Crown Heights Community Jewish

3   Counsel, Jewish Community Relations County of New York, Jewish

4   Board of Rabbis, Union of Orthodox Congregations, Institute of

5   Public Affairs, United Organization of Williamsburg, United

6   Synagogue of Conservative Religion.  Have you seen that?

7        MR. QUIJANO:  No, I have not.

8        THE COURT:  Next, I have a letter from Mr. Roger

9   Bennett Adler, an attorney, dated August 5th, 2003

10  transmitting to me a copy of the family's sentencing

11  submission addressed primarily to the legal issue of whether

12  the sentencing court is authorized to impose a sentence in

13  excess of ten years, and that document is called Brief of the

14  Family of Yankel Rosenbaum Amicus Curiae.  There is another

15  letter of transmission August 1, 2003.  The brief is signed by

16  Nathan Lewin of the law firm of Lewin & Lewin, Washington,

17  D.C., have you received that?

18        MR. QUIJANO:  Yes, we have.

19        THE COURT:  Next I have a letter of August 8th, 2003,

20  from the esteemed law firm Mischle M-I-S-C-H-L-E Neuman and

21  Faughn signed by James E. Neuman, and that is on behalf of the

22  defendant.  So, obviously, you have received that.

23        MR. QUIJANO:  Yes, Your Honor.

24        THE COURT:  And more important, has the government

25  received that ?

```
1              MS. RESNICK:  Yes, Judge.

2              THE COURT:  And also, I have the recent submission

3    from the government in response to the last referenced

4    document and that is a letter of August 14, 2003, signed

5    collectively by Ms. Resnick and Ms Dugger.  Have you received

6    that?

7              MR. QUIJANO:  We have, Your Honor.  If we could

8    briefly address the documents we have not received?

9              THE COURT: Would you like a moment to read that?

10             MR. QUIJANO:  I do not know if that is necessary.  If

11   they don't enter into any legal issues such as the amicus

12   curiae, I don't believe we need to take time at this point to

13   read them.

14             THE COURT: Why don't I just for the sake of

15   completeness let you have a moment to look at them.

16             MR. QUIJANO:  Certainly.  Thank you.

17             (Pause in the proceeding)

18             MR. QUIJANO:  Thank you, Your Honor.  We have no

19   additional comment at this time regarding these two documents.

20             THE CLERK:   Shall I show it to the government?

21             THE COURT: Yes, show it to the government.

22             (Mr. Innelli handing to Ms. Resnick)

23             (Pause in the proceeding)

24             MS. RESNICK:  Thank you.

25             THE CLERK:   You are welcome.
```

1          THE COURT: All right.  Are we ready to proceed,

2    Mr. Quijano?

3          MR. QUIJANO:  Yes, Your Honor.

4          THE COURT:  All right. Now, let me advise you that I

5    have a recommendation from the probation office, and I want to

6    share that with you just so you are advised what the probation

7    department has submitted to me in terms of the recommended

8    sentence.

9          One hundred twenty months of imprisonment.  That's

10   the statutory maximum, followed by three years supervised

11   release, with a number of special conditions. They recommend

12   substance abuse treatment, that the defendant shall not

13   possess weapons, including knives, razors, box cutters or any

14   such sharp weapons and a search condition, and of course, $50

15   special assessment which is required by law, and the proposed

16   model search condition, and also recommend that no fine be

17   imposed because the defendant does not have the ability to pay

18   a fine.  And also, that during the period of supervised

19   release, the defendant be prohibited from possessing a

20   firearm.  That's basically what probation has said.

21         Now, Mr. Quijano, let's make our sentencing

22   calculations at this time.  In that respect, let's turn to the

23   most recent update from the probation office, and let's turn

24   to page three.  Let's start with the base offense level.

25         Does either side take any issue with the recommended

1    base offense level of 15 as contained in paragraph seven of

2    the updated presentence report?

3              First the government?

4              MS. RESNICK:  No, Judge.

5              MR. QUIJANO:  No, Your Honor.

6              THE COURT: Just for the record, that's based upon the

7    use of guidelines to 2H1.3A, and based upon the offense of

8    conviction we turn to that guideline which is labeled use of

9    force or threat of force to deny benefits or rights in

10   furtherance of discrimination; damage to religious real

11   property. It speaks in terms of a base offense level of ten if

12   no injury occurred, which is not this situation; 15 if injury

13   occurred, which is this situation; or two plus the offense

14   level applicable to any underlying effects.  So we then are

15   relegated to what is the most comparable underlying offense,

16   and we agree that it is aggravated as set forth in 2A2.2. I

17   know this sound s like a lot of numbers and it is very

18   difficult for lay people to understand the intricacies of our

19   sentence, but nonetheless, that is the law that Congress has

20   given to us that we are to apply.

21             The aggravated assault provides for a base offense

22   legal of 15 and then provides that if a firearm was discharged

23   increase by five. If a dangerous weapon, including the firearm

24   was otherwise used, increase by four levels. So now we have a

25   specific offense characteristic that requires us to increase

1    by four levels because of the fact that we do have a dangerous

2    weapon in the personage of the knife.  So we agree that the

3    four levels are to be added to 15 level base offense level?

4         MS. RESNICK:  Yes.

5         MR. QUIJANO:  Okay.

6         THE COURT:  That brings us to another specific

7    offense characteristic that is set forth 2A2.2(b)(3)(c).  If

8    the victim sustained bodily injury we are to increase the

9    offense level according to the seriousness of the injury.  In

10   this case the defendant's actions caused permanent or life

11   threatening or bodily injury which requires a six level

12   increase, and we are in agreement with that, I suspect, as

13   well.

14        MR. QUIJANO:  Yes.

15        MS. RESNICK:  Correct.

16        THE COURT:  We are advised under another section of

17   2A2.2 that the cumulative adjustment for the two specific

18   offense characteristics that we just identified are not to

19   exceed nine levels.  Since they do add up to ten levels, we

20   have to subtract one level.  Now we go to 2H 1.3A3 which

21   requires us to add two levels because it provides that we are

22   to have 2 plus the offense level applicable to any underlying

23   offense.  We are in agreement with that I take it as well,

24   correct?

25        MR. QUIJANO:  Correct.

1          THE COURT:  Now we come to one that the parties have

2     taken issue with in terms of whether the Court should or

3     should not apply an additional level of two points for

4     obstruction of justice.

5          The presentence report recommends it and at this time

6     I will allow counsel to comment about it since we take issue

7     with its application.

8          MR. QUIJANO:  So it is clear for the record, our

9     objection is not only to the guideline calculation, but also,

10    as an objection to one of the grounds the government has

11    raised in its request that the Court upwardly depart to this

12    extraordinary maximum of ten years.

13         THE COURT: We are not up to upward departure yet.

14         MR. QUIJANO:  The argument in terms of an obstruction

15    of justice will be the same at least in terms of our position

16    regarding this.

17         THE COURT:  On a previous occasion I gave the parties

18    specific notice that the Court was contemplating an upward

19    departure here. So the parties have been put on notice for

20    some time.  Go ahead.

21         MR. QUIJANO:  If the Court will bear with me, most of

22    my comments are directed to the myriad instances listed by the

23    government. First as to the alleged false testimony during the

24    State's suppression hearing.  Your Honor, for the Court to

25    impose such a departure it must find that the State's conduct

1  in question must have an actual effect on the federal

2  proceeding. Obviously, there is no basis whatsoever to

3  conclude that alleged perjury by the defendant during the

4  State suppression hearing was material to the federal action

5  or had any discernible impact on the investigation or

6  prosecution or trial of this matter.

7          THE COURT:  But certainly it had an influence on the

8  evidentiary ruling as to whether to allow the prior assertion

9  of fact by counsel at the prior proceeding into evidence in

10  this proceeding, so certainly I had to spend time, conduct a

11  separate hearing, and to make a determination on that

12  evidentiary issue.  Doesn't that have a direct effect upon

13  this proceeding?

14          MR. QUIJANO:  I think the focus should be exactly on

15  the McKeon aspect.  Certainly, the government has raised that

16  as a discrete independent ground. We believe it certainly

17  should be treated separately. However, in terms of the current

18  federal law, it's clear that before the Court could upwardly

19  depart or even grant the two point enhancement for obstruction

20  of justice for the State proceeding, there has to be in the

21  language of the cases a discernible impact.  While it may have

22  been related in this Court's eventual determination on the

23  McKeon issue, I don't think it would be a fair

24  characterization to say that testimony of the Supreme Court

25  hearing, which certainly was not directly at issue on McKeon,

1    would have a direct impact on this. We are also limited, as

2    the Court noted, we were limited in all of the allegations or

3    discussions at the McKeon hearing and suggested the State

4    proceedings because prior counsel in that matter was deceased,

5    was not able to provide the Court or the parties with any

6    position in terms of his recollection.

7         THE COURT:  Well, you are talking about only the

8    State proceeding.

9         MR. QUIJANO:  Only about the State.

10        THE COURT: I am talking about the federal trial

11   before Judge --

12        MR. QUIJANO:  No.  I am talking about the State

13   proceeding where Mr. Lewis represented the defendant. At any

14   rate, our position simply is there was no sufficient

15   discernible impact on federal investigation prosecution or

16   trial by the alleged -- and I repeat -- alleged misstatement

17   or perjurious testimony during the Supreme Court hearing.  The

18   government also contends that during a prior federal trial

19   before Judge Trager, Mr. Nelson obstructed justice in several

20   ways. In addition, the government suggests Mr. Nelson

21   obstructed justice during the McKeon hearing.  We simply

22   submit each of these arguments is without merit. Let me

23   quickly go to the McKeon issue.

24        THE COURT: Slow down and take your time.

25        MR. QUIJANO:  We stated our position at trial that

1    Mr. Nelson testified truthfully at the McKeon hearing.  The

2    government in its latest submission suggested that we

3    conveniently omitted a portion of the transcript where prior

4    counsel gave a rambling description of what he knew and when

5    he knew it. We remind the Court of the sequence of events

6    during the colloquy between the Court and prior counsel. It

7    certainly seemed apparent to us that the Court was not

8    satisfied with prior counsel's initial explanations to the

9    Court's questions. Indeed, we submit that the transcript

10   clearly shows that when the Court focused on prior counsel by

11   posing direct questions on the issue, prior counsel said he

12   cannot recall whether Mr. Nelson had, as he claimed, told him

13   that he had stabbed the victim. Now, notwithstanding  -- and

14   it is rather difficult to believe an attorney would have no

15   recollection either way with regard to such a salient matter

16   as whether his client told him whether he had or had not

17   stabbed the man he's accused of killing, especially given the

18   circumstances surrounding this case, the fact of the matter

19   remains, Your Honor, that Mr. Nelson's testimony was not

20   directly inconsistent with prior counsel's. Of course, we

21   found it significant that this Court during the McKeon

22   hearing, once it had reflected and changed its initial

23   position, still did not find Mr. Nelson's testimony as

24   perjurious. Accordingly, we respectfully submit that before

25   this Court could base an upward departure upon a premise that

1    Mr. Nelson committed perjury during the McKeon hearing, we

2    respectfully submit further findings of fact would be

3    necessary.  And of course, it follows that before the Court

4    could make those additional findings of fact, the defendant

5    would be entitled to a Fatico hearing where he will be

6    permitted to present witnesses which we offered to do during

7    the initial McKeon hearing and where counsel would finally be

8    permitted to cross-examine Mr. Nelson's prior counsel under

9    oath.

10            With regard to basing the departure based on

11   defendant's statement during the sentencing before

12   Judge Trager which the government raises in its moving papers,

13   as we stated in our moving papers, it was not made to a

14   probation officer during a presentence investigation, nor was

15   it a sworn statement during sentencing. As noted in

16   application note 5B, section 3C1.1, the making of false

17   statements not under oath to law enforcement officers does not

18   warrant an application of this  --

19            THE COURT:  The statement was made to Judge Trager.

20            MR. QUIJANO:  The government in its most recent

21   papers point to section 4F, the application note to that

22   section, as indicating that would permit this Court to impose

23   the enhancement as a result of a false statement to a judge.

24            We remind the Court, however, that the Second Circuit

25   has stated in United States versus Johns that an unsworn

1    denial of guilt, even a false and material unsworn denial of

2    guilt, cannot become the predicate of obstruction of justice

3    enhancement, and we believe given those two application notes

4    where they are placed, they recognize the distinction between

5    a false statement to a judge and a false statement under these

6    circumstances which could readily be characterized as an

7    unsworn denial of guilt.

8           The same --

9           THE COURT:  I am sorry.  I didn't mean to interrupt.

10          MR. QUIJANO:  The same reasoning is applicable with

11   regard to the suggestion that the departure is warranted as a

12   result of his prior counsel's cross-examination of Ms. Shaw or

13   his arguments during closing.

14          Section 3C1.1 is not intended to punish a defendant

15   for the exercise of his constitutional right to cross-examine

16   witnesses.

17          The base enhancement as a result of counsel posing

18   questions on cross-examination would surely then be denial of

19   his Sixth Amendment rights.  Indeed, as Justice White noted in

20   United States versus Wade, more often than not, defense

21   counsel will cross-examine a prosecution witness and impeach

22   him if he can even if he thinks the witness is telling the

23   truth.

24          Surely, zealous cross-examination can never be the

25   equivalent of suborning testimony. Of course, the government

1    fails in its papers to demonstrate how the cross-examination

2    of Ms. Shaw was misleading, let alone, explain why Mr. Nelson

3    should be held responsible for his prior counsel's tactics.

4            THE COURT:  I am not going to base my determination

5    on the questioning of Ms. Shaw. I am going to focus on the

6    so-called McKeon hearing.

7            MR. QUIJANO:  Let me reiterate what I said.  We

8    believe based on the status of the current record, if the

9    Court were going to grant a departure based on the McKeon

10   hearing, given the fact that even though the defendant through

11   counsel requested an opportunity to call witnesses at that

12   time, even though the defendant through counsel requested over

13   and over again, once the Court had reversed itself for an

14   opportunity to confront prior counsel, we believe in all

15   fairness, before the Court could proceed, additional findings

16   of fact would have to be made, which would require a Fatico

17   hearing where we will be given that opportunity.

18           Certainly, there are other grounds and other issues

19   for this Court to decide this afternoon. I am cognizant of

20   rule 32 which certainly, at least for the departure purposes,

21   provides a vehicle where if the Court does not need to reach

22   or make a finding of fact as to a particular issue that's in

23   dispute, it need not rule. Obviously, that does not answer the

24   two point enhancement in terms of the guidelines calculation.

25           THE COURT: I am not going to base any of the

1   departure on the obstruction of justice, although arguably I

2   could go in that direction.  So you are advised you don't have

3   to talk about the things which won't be relevant.

4           MR. QUIJANO:  That is comforting.

5           THE COURT:  Ms. Resnick, do you wish to make comment

6   before I make my ruling?

7           MS. RESNICK:  With respect to the two point

8   enhancement based on McKeon, the testimony of this defendant

9   at that McKeon hearing was directly contradicted by the

10  testimony of his prior lawyer Trevor Headley who specifically

11  said despite the fact that the defendant gave him a narration

12  of the defendant's -- of the night in question, he did not

13  tell him that he had stabbed Yankel Rosenbaum, and the first

14  time Mr. Headley learned of that fact of that admission on the

15  part of the defendant was after the conclusion of the first

16  federal trial.  The Court held a lengthy ex parte hearing.

17  The Court made credibility findings that were clear and

18  explicit, finding this defendant's testimony at that hearing

19  under oath incredible.  Those findings are more than

20  sufficient based on that factual record to give the two point

21  enhancement based on the McKeon hearing.

22          THE COURT: Now, I agree with that position. If the

23  so-called McKeon hearing -- we all understand what we mean by

24  that. What we mean by that is that it was a very important

25  part of the trial.  We had to impose upon the jury for a

1    sustained period of time while we conducted an in camera

2    proceeding because the position of the defense had radically

3    changed from the prior federal trial and it was a profound

4    change and it required the Court to spend a considerable

5    amount of time and energy and stay up basically the entire

6    night after I made my initial determination reflecting and

7    thinking about it over and over again until I decided that the

8    right decision was the one I made the following morning.

9    There is no question about the materiality.  I had to instruct

10   the jury as to whether that assertion by counsel at the prior

11   trial would be permissible in evidence in this proceeding. So,

12   certainly, what transpired during the in camera McKeon hearing

13   was material to what I had to address in the course of the

14   proceeding.  At the time I made my determination at the

15   so-called McKeon hearing I did not have available to me the

16   minutes of the sentencing proceeding before Judge Trager. I

17   tried to get a copy of the minutes.  Either they weren't

18   transcribed or I could not locate them under the time

19   constraints that I had to deal with at this time.  I

20   subsequently had seen them. I made that determination at the

21   end of the McKeon hearing and I will now consistent with that

22   make the following findings with respect to the obstruction of

23   justice, which I am obliged to make.

24          I find by the preponderance of the evidence and

25   during the McKeon hearing the defendant falsely testified that

1    he told his defense attorney who first tried this case Trevor

2    Headley -- what I mean by that was that he tried this case

3    during the prior federal proceeding.  That's all I based it

4    on.  I didn't take into consideration what happened during the

5    State proceeding. Anyway, that he falsely testified that he

6    told Mr. Headley that he did not stab Yankel Rosenbaum. I

7    listened very carefully to Mr. Nelson's testimony at the

8    hearing as well as to Mr. Headley and they both testified

9    under oath, and I concluded that Mr. Headley's testimony was

10   credible, and that the defendant's testimony was not credible.

11          Now, having looked at the sentencing minutes before

12   Judge Trager, I find my assessment of the credibility,

13   reinforced and emboldened actually by what Mr. Nelson said to

14   Judge Trager, which just belies his claim that he did tell Mr.

15   Headley that he did not stab Yankel Rosenbaum, and I point

16   specifically to Mr. Nelson's comments at the sentencing

17   proceeding before Judge Trager as follows:

18          "Mrs. Rosenbaum, I sympathize with you for the loss

19   of your son but I didn't have no actions.  I had no part of

20   it."

21          So that is a radical change from the trial to

22   reinforce the credibility determination that I made at the

23   conclusion of the hearing.

24          So I find in regard to the statement that was made at

25   the McKeon hearing by Lemrick Nelson that he willfully made a

1    false statement and that his false statement was, indeed,

2    material to this present trial before me.

3          I view it as a perjury even though I don't think I

4    have to characterize it as such to accommodate the

5    requirements of 3C1.1 which sets forth a non-exhaustive

6    listing commission of perjury in subdivision 3B, but also

7    provides in subdivision 3F that it is obstruction of justice

8    if somebody provides materially false information to a judge

9    or magistrate, and I don't see where an oath or finding of

10   perjury is necessary when somebody is speaking and providing

11   information to a judge or a magistrate, and case law supports

12   that in my opinion.  But in any event, whether you view this

13   as subdivision F or subdivision B, my finding is clearly made

14   that there was here the willfully making of a false statement

15   by Mr. Nelson that was material to this case.  So the two

16   levels for obstruction of justice will be added to the

17   calculation of our total offense level.

18         Now, that brings us to an adjusted offense level of

19   28, and there is no other adjustment that I can glean from any

20   papers in front of me. So that gives us a total offense level

21   of 28. We have and agreed, I guess, with the criminal history

22   category of two.  There is no question about that.

23         MR. QUIJANO:  Correct.

24         THE COURT:  The upward departure under the sentencing

25   we are talking about is from the range of imprisonment of 87

1    to 108 months.

2            Now, we specifically come to the issue of upward

3    departure and I put everybody on notice that I was going to

4    consider that.  I gave everybody an opportunity to be heard.

5    Is there anything further you wish to address in respect to

6    that in addition to what you have already said?

7            MR. QUIJANO:  We are now turning to the other

8    grounds, death results?

9            THE COURT:  Yes.

10           MR. QUIJANO:  So I am clear, this would be the only

11   ground that the Court would be considering, not the other

12   grounds raised by the --

13           THE COURT: Yes, I am going to base my determination

14   on the issue of death resulting.

15           MR. QUIJANO:  Very well.  If the Court pleases, then,

16   where section 5k1.2 does permit a departure where death

17   results from the crime this Court may only depart if the

18   conduct has not already been accounted for elsewhere in the

19   calculations. To do otherwise would result in impermissible

20   double counting and is clearly prohibited by the guidelines.

21   While the probation office -- now all parties agree that the

22   current level after the necessary enhancements is a level 28.

23   To get to that the guideline calculations require an increase

24   of six levels for permanent or life threatening bodily injury

25   pursuant to 2A2 .2. Your Honor, it's defendant's position that

1    that enhancement overlaps and accounts for the same punishment

2    as would result from a departure based on result in death

3    since it is clear that both would arise from the same conduct

4    regardless of what it's called or characterized as, that is,

5    the attack in the stabbing of Mr. Rosenbaum. I think it might

6    be instructive and helpful for the Court if I read some of the

7    actual language of 5k2.1 which indicates certain factors that

8    a sentencing court should consider in the determination

9    whether this enhancement is warranted.

10           It reads in part:

11           That matters that would normally distinguish among

12   other levels of foresight, such as defendant's state of mind

13   and the degree of planning and preparation, other appropriate

14   factors or whether multiple deaths resulted, and the means by

15   which the life was taken.

16           Your Honor, this court is intimately familiar with

17   the facts which were elicited during this trial. It is

18   intimately familiar with the circumstances of what took place

19   August 19th, 1991 and more specifically, in relation to the

20   conduct of our client in the act that he undertook that night.

21   Needless to say, there is no question, this is not multiple

22   homicides.  Needless to say, there is no question this was not

23   a lying in wait or particularly heinous matter that was

24   planned.  It was completely unplanned.  It was a riotous and

25   chaotic situation that arose from a tragic accident where an

1    entire community rose up. Simply put, Your Honor, I don't

2    think it is fair to try and characterize whatever Mr. Nelson

3    did, as inexcusable as it was and as tragic as the results

4    were, I don't think it is fair to try and characterize it as

5    fitting within the language of 5k2.1. More importantly,

6    perhaps, in terms of what this Court is permitted to do and

7    prohibited from doing pursuant to the guidelines is the fact

8    that this Court cannot engage in double counting.

9         The government responded in their papers. Let me

10    address that. It seems to me that it might be instructive for

11    the Court to consider the way a different section in the

12    guidelines is addressed in terms of dealing with the other

13    conduct in other situations. I refer to 5G1.3 which deals

14    with consecutive and concurrent sentences when a district

15    court is forced to sentence someone for a federal matter where

16    there is a prior state sentence. The application notes in that

17    guideline in the cases that have evolved from that make clear

18    that the court must sentence a defendant to consecutive time

19    when the conduct for which he's been sentenced in the prior

20    state sentence arises or is essentially the same conduct.

21         I submit that's what's going on in this situation. In

22    other words, by the Court's guideline calculations in 2A2.2,

23    it has already taken into effect, into consideration precisely

24    the same conduct that the government now chooses or asks that

25    this Court upwardly depart, and that is, the death which

1    resulted.

2          THE COURT:  All right. Does the government wish to be

3    heard?

4          MS. RESNICK:  Yes.  Under the defense suggestion that

5    Yankel Rosenbaum's death which was caused by wounds inflicted

6    by the hand of this defendant to his torso, which punctured

7    his lungs and resulted in his death is fully accounted for by

8    an enhancement for serious bodily injury is plainly wrong both

9    on the law and on the facts.  And as a basic moral matter, the

10   permanent loss of a victim's life is far more devastating to

11   that victim and the victim's family than that and not that

12   that victim could have otherwise survived.  This Court may and

13   should find, we respectfully submit, by a preponderance of the

14   evidence which is standard for sentencing before this Court

15   that this defendant's conduct resulted in Yankel Rosenbaum's

16   death, and this Court should thus sentence this defendant

17   based upon the actual and real consequences of his actions

18   which was the loss of life of a completely innocent man. The

19   suggestion that a serious bodily injury enhancement covers or

20   accounts to -- fully accounts for that death is unacceptable

21   as a matter of law and as a matter of fact. And we submit to

22   the Court, as we did in our papers, that the guidelines

23   expressly and clearly and in a very straightforward way apply

24   this kind of an application for an upward departure under the

25   circumstances just as in this case.

1          THE COURT:  All right. Now, Mr. Quijano, in response

2     to your legal arguments, since we are constrained to apply the

3     aggravated assault guideline, we have added six levels because

4     the guideline which speaks in terms of bodily injury talks

5     about adding six levels of permanent or life threatening

6     bodily injury. What is painfully absent from that guideline is

7     any distinction between permanent or life threatening bodily

8     injury on the one hand, and death resulting on the other.  So

9     it seems to me that if I make this finding, which I will rule

10    on shortly, that clearly the death of Yankel Rosenbaum was not

11    taken into consideration in the aggravated assault sentencing

12    guideline. It is a factor that is not accounted for at all,

13    let alone appropriately or fully accounted for.  I just want

14    to respond to you on the issue of law.

15         The sentence that I will render will also include my

16    determination on the issue of departure -- upward departure.

17    I think before I make that determination I should give

18    Mr. Nelson an opportunity to speak to me, since it does affect

19    the sentence and I will do it at that time after I hear him.

20    Is there anything else you wish to add at this time?

21         MR. QUIJANO:  Only procedural.  The government also

22    made myriad requests for additional conditions of supervised

23    release.

24         THE COURT:  We will get to that.

25         MR. QUIJANO:  I see.

1        THE COURT: Also a sentencing matter but you can

2    address it now.  What I want you to do is I want us to discuss

3    everything that counsel wishes to discuss before I render my

4    decision.  I want to address Mr. Nelson before I do that. So

5    let's move on now.  Let's move on now to what you may have to

6    say about conditions of supervised release.

7        You don't have to be overly extensive because I am

8    not inclined to impose a curfew or to restrict Mr. Nelson's

9    right to look at television or things of that nature, but I

10   will give the government an opportunity to speak to that also.

11       MR. QUIJANO:  We appreciate the Court's guidance and

12   just so I am clear, if the Court at this point is not inclined

13   to impose an additional condition of supervised release, nine

14   o'clock curfew or the area dealing with either freedom of

15   association or what he can view, possess, the government also

16   asks for, I think, what was described as intensive or

17   supervision by the intensive supervision unit.  We don't

18   believe that's appropriate.  We believe that is a matter left

19   for probation.  I can go into detail, unless the Court  --

20       THE COURT:  Let me tell you what I am contemplating.

21   I am contemplating the use of our community confinement

22   facility, our halfway house, as a condition of supervised

23   release. I think it is particularly appropriate here and I

24   want to share that with you, so you can address it.  But in

25   that respect I have reached out to the community confinement

1   people and I am thinking in terms of rehabilitation now as

2   part of supervised release. I think it is necessary here.

3          MR. QUIJANO:  I'm a little confused.  Is the Court

4   considering it as  --

5          THE COURT: We are talking about possible conditions.

6          MR. QUIJANO:  After he was released from prison?

7          THE COURT:  That is when supervised release --

8          MR. QUIJANO:  I never heard of a halfway house.  I

9   had heard it in a different context but --

10          THE COURT:  And I have done some research.  I visited

11   our local halfway house in Brooklyn and I was very impressed

12   with the fact that the orientation there as well as they try

13   to provide some structure, provide some necessary supervision

14   to assist in adjustment to the outside world and of particular

15   importance, they are geared to assist people in gaining

16   employment. They have a list of people that they deal with who

17   are inclined to allow those such as Mr. Nelson to have

18   employment opportunities.  They aid in employment searches.

19   They allow them to leave the facility to seek employment and

20   indeed, to work. The legal resource guide to the Federal

21   Bureau of Prisons speaks of community confinement centers as

22   follows: To assist offenders "and in finding a job." Very

23   important for Mr. Nelson here locating a place to live.  That

24   may or may not be more or less important.  He is not going to

25   be living with his family. I think there is some reference to

1    a parental sister that may provide a home for him and

2    reestablishing family ties.  The guide also says that every

3    offender placed in a CCC is provided with structured programs,

4    job placement service and counsel, and closely monitor that,

5    monitored activities, inmate programs, individualized and

6    tailored to program needs of the offender being aware of the

7    importance to everybody considering the sentence.  I, in

8    addition to relying upon that guide, spoke to the community

9    corrections manager of the Federal Bureau of Prisons and asked

10   specifically what experience they have had in terms of what's

11   the most effective period of time for somebody to avail

12   themselves of these rehabilitative opportunities that exist

13   when somebody gets out of jail and Mr. Menkel (ph) advised me

14   that this type of supervised release should be for at least

15   six months in order to maximize the benefits associated with

16   the available programs.

17          Also, being mindful of how important it is to try to

18   tailor make this rehabilitation, the best benefit,

19   Mr. Menkel, also advised me that there is a comprehensive

20   sanction center, I think it is located in New Jersey, that

21   offers particular types of programs which may be something

22   very reasonable for Mr. Nelson. Specifically Mr. Menkel

23   advised me it offers life enhancement skill classes at this

24   particular center, maintains close contact with the probation

25   office when making programming decisions.

1        In short, by the way, that community action center is

2   located in Newark, New Jersey.  What I am trying to impress

3   upon you, Mr. Quijano, is that I do think Mr. Nelson needs

4   this type of assistance for his rehabilitation. He needs an

5   opportunity to meet with people who will try to get employment

6   for him.  He needs an opportunity to work in a structured

7   environment.  He needs an opportunity to improve his life

8   skills. He has had some problems in this respect as you know

9   over the years.

10       Now, the reason why I mention this is because in

11  fairness to you and to Mr. Nelson, I want to let you know the

12  efforts I have made in terms of the rehabilitative aspects of

13  the sentence.  So you can comment, if you like, with respect

14  to that. I find that to be more essential than perhaps a

15  curfew at nine or eight or ten or restricting his so-called

16  constitutional rights to associate. I think he needs this type

17  of supervision. So you can comment about that or anything else

18  at this time.

19       I turn to the government before I turn to Mr. Nelson.

20       MR. QUIJANO:  If Your Honor pleases, I am sure I

21  speak for Mr. Nelson as well as all of us in our appreciation

22  for the efforts the Court has done. However, I must raise this

23  question. Certainly, my initial concern with the government's

24  myriad additional conditions was a question in my own mind of

25  why this defendant. This Court certainly does not sit in a

1   vacuum as neither does counsel.  Both this Court, the

2   government and counsel, have participated in hundreds if not

3   thousands of sentences where individuals who have been

4   sentenced by this Court and other judges within this court

5   have never had to even consider these kinds of additional

6   conditions.

7           THE COURT:  I have sentenced people many times to the

8   halfway house in Brooklyn.  I have visited it personally to

9   satisfy myself that they really are geared to helping people

10  reenter into the population.

11          MR. QUIJANO:  I appreciate that.

12          THE COURT:  I don't think this is the first time I am

13  considering this.

14          MR. QUIJANO:  I am not suggesting that, but what I

15  think, what the Court does need to consider is who this 28

16  year-old man is today, not the 16 year-old boy who committed

17  this conduct and hasn't he earned at least the opportunity to

18  show the probation department, the Court the government and

19  all concerned that he can readjust to society under the usual

20  guidelines and supervision afforded by supervised release?  Is

21  there really a record at this point in terms of his most

22  recent his story?

23          THE COURT: His most recent history is he has been

24  incarcerated.

25          MR. QUIJANO:  That is correct and there are four

1    minor instances of difficulty.

2         THE COURT:  Four minor instances but he has not been

3    able to live in the prison population without incurring these

4    instances.

5         MR. QUIJANO:  None of them were violent related.

6    They dealt more with refusing an order.  Certainly, that is

7    not akin to the type of history that  --

8         THE COURT:  Does he have any employment?

9         MR. QUIJANO:  Your Honor, he has a place to stay with

10   his family.  He certainly seeks employment.  He seeks to go

11   back to school.  All of these can be monitored by the usual

12   type of supervision.

13        THE COURT:  We are going to give him the benefit to

14   have an opportunity to have these folks who do a wonderful job

15   there actually send him out to prospective employers.

16        MR. QUIJANO: Why can't they do that under normal

17   supervision?

18        THE COURT:  Because I think he needs rehabilitation.

19   Does the government have anything to say about this because

20   you didn't know I was thinking about this either?

21        MS. RESNICK: Yes, we think it is a very useful idea

22   to have restrictions as we have requested in our papers -- not

23   in this form -- to have restriction on this defendant upon his

24   release from jail.  Specifically in addition to what

25   Your Honor has suggested, which should provide monitoring and

1    structure, which is what the government is seeking, there were

2    two particular conditions:  The condition that this defendant

3    be prohibited from possessing a weapon, including specifically

4    a knife, and a consent to search, so probation can do

5    reasonable searches.  The only thing I would like to add is

6    that we have to have a victim statement.  We would like to

7    have an opportunity to explain to the Court at the appropriate

8    time before the imposition of sentence.

9         THE COURT:  That is your entitlement. Which comes

10   first?  I guess I should hear the victim statement before I

11   hear from Mr. Nelson. Mr.  Nelson will be the last person to

12   speak.

13        MR. NEUMAN:  If I understand Your Honor correctly,

14   you have considered a couple of different places for the

15   community center.  Have you chosen one or is that -- I am just

16   wondering logistically, are you delegating that decision?

17        THE COURT:  No. The placement will be up to the

18   Bureau of Prisons through their community correction center

19   facilities. I am going to recommend the New Jersey facility

20   because they have these special skills there in terms of life

21   skill opportunities.  Let's face it, when he gets out of jail

22   everybody wants Mr. Nelson to make a proper adjustment. It is

23   important that when he gets out of jail he has the best

24   rehabilitative opportunity so he can live peacefully with

25   himself and society.  That is a concern I have in terms of

1    sentencing rehabilitation.  That is one of the essential

2    aspects of sentencing. I am concerned about that.

3          All right.  Enough said about that. At this time I

4    think we can listen to the victim impact statement.

5          MR. QUIJANO:  Should we sit?

6          THE COURT:  Who is going to speak?

7          MS. RESNICK:  Mrs. Fay Rosenbaum, Mr. Rosenbaum's

8    mother, on behalf of family.

9          THE COURT:  Maybe we can make a little room, a little

10   comfort room.

11         MR. QUIJANO:  May we sit?

12         THE COURT:  Yes.

13         THE COURT: Mrs. Rosenbaum, do you wish to sit or

14   stand or however, make yourself comfortable. The courtroom is

15   yours.

16         MRS. FAY ROSENBAUM:  I will stand.  Thank you,

17   Your Honor.

18         Your Honor, I wish to thank you for the opportunity

19   to speak here today. This is the twelfth anniversary to the

20   day of the death of my son Yankel that resulted from the

21   wounds inflicted on him by Lemrick Nelson.  I trust that what

22   I am about to say on behalf of my husband and family will be

23   of assistance to Your Honor in determining a just sentence for

24   Lemrick Nelson.

25         Much of what I am now about to say to you I said

1    previously to His Honor, Judge Trager, when he sentenced

2    Lemrick Nelson on 31 of March 1998 for violating Yankel's

3    civil rights on exactly the same charge as he was again

4    convicted of at the conclusion of the recent trial presided

5    over by Your Honor.  Although, almost five and a half years

6    has elapsed since I addressed Judge Trager, what I said to him

7    is even more relevant today as I stand before you.

8         Although unable to attend the latest trial

9    personally, with the assistance of my son Norman who did

10   attend each and every day, my husband and I closely monitored

11   its progress, and most importantly, the verdict of the jury.

12   Similarly, we have carefully reviewed the papers submitted to

13   you by both the government and the lawyers to the defendant.

14        I will never be able to adequately express the

15   enormity of the loss that has been suffered by and continues

16   to be suffered as a result of the murder of my son Yankel.

17   This is a loss experienced not only by me as his mother and by

18   my husband Max, Yankel's father, but indeed, by all who ever

19   came into contact with Yankel -- be they family, friends,

20   academic colleagues or business associates.

21        Yankel left a positive and indelible impression upon

22   everyone whom he met.  The true extent of how much this is so,

23   I have only come to learn of and appreciate following his

24   death.  Indeed, this is an ongoing learning process that

25   continues to this very day, twelve years after his murder --

1    with people, often total strangers, telling us for the first

2    time of their very positive experiences and encounters with

3    Yankel.

4            To my husband and I, Yankel was a devoted son who,

5    since he was a teenager, he literally cared for our every

6    need, irrespective of how mundane that may have been --

7    nothing seemed too trivial or too much for him and our

8    well-being was always his first concern -- paramount. Indeed,

9    we relied on Yankel's assistance in every way, particularly

10   since my husband and I began to experience illness and

11   infirmities of age. This was so even when he was here in New

12   York. Not a day went by without receiving from Yankel a phone

13   call or a fax.  From so far away, somehow he still managed to

14   ensure that our every need was attended to. I remember as if

15   it were only this morning, his words that he would always be

16   there for my husband and me, "whenever and wherever," and that

17   the 12,000 mile distance between him here in New York and us

18   in Melbourne was no obstacle as far as he was concerned -- but

19   that, Your Honor, was our Yankel.  He was a do-er.

20           Challenges brought out the best in him.  The

21   sensitivity, compassion, was complemented by his inherent

22   determination, commitment and principles.  Yankel enjoyed life

23   and longed to see others enjoy life at least to the same

24   extent, but if he saw someone required help, he did not wait

25   to be asked for his assistance. He had initiative and he took

1    the initiative. And it is the contributions he made -- to his

2    family and friends -- in academia and business that are so

3    sorely missed in the wake of his murder, by all who knew him.

4              To his older brother Norman, Yankel was his best

5    friend.  My husband and I are proud of both our sons, and most

6    of all, because of the manner in which they truly cared for

7    each other -- without hesitation or reservation.

8              Norman's wife Ettie was more of a sister than a

9    sister-in-law to Yankel, and nothing shown more brightly in

10   Yankel's life than his three nephews.

11             The diversity of the many people Yankel knew who

12   considered him a good friend, a true friend, someone you could

13   always rely on, typified the real Yankel, a person who took

14   people as he found them irrespective of race, creed or color,

15   who did not concern himself with another's background or

16   pedigree, education or worldly possession and liked you for

17   who you are, not for what you are, or what you have.

18             For those he chose not to befriend he, nonetheless,

19   respected.  I vividly remember his absolute abhorrence of

20   discrimination of any kind, his unqualified defense of the

21   oppressed and down trodden, and his inflexible principles of

22   fairness, equality, truth and justice.  That was the real

23   Yankel Rosenbaum that Lemrick Nelson would have found had he

24   bothered to seek, had he not vented his putrid violent hate

25   -- calling for Yankel's cold blooded murder and carrying it

1    out with no regard or respect for Yankel the person, but with

2    a blind baseless bigotry aimed at what Yankel was -- a Jew.

3         Arguably the single most important example of these

4    principles practiced by Yankel is to be found in Yankel's

5    identification of Nelson as his stabber.  As you heard in

6    uncontradicted evidence, that identification of

7    Lemrick Nelson was made by Yankel was immediate and precise

8    -- direct and without qualification. His family and all those

9    who new Yankel always knew that his identification of

10   Lemrick Nelson was made by him without any doubt.  Yankel

11   would never have accused anybody of anything unless he was one

12   hundred percent certain.

13        Lemrick Nelson has continuously and consistently lied

14   and denied over an eleven and a half year period of stabbing

15   Yankel, but this lie is only one of the litany of lies that

16   Nelson has told in a pathetic attempt to escape responsibility

17   for his cowardly and vicious attack on Yankel that resulted in

18   his murder.  As late as during this trial, Lemrick Nelson

19   without compunction blatantly lied to Your Honor when on the

20   5th of May, year 2003 and that was after Your Honor had

21   specifically and clearly cautioned him that if he lied to you,

22   you would recommend that he be prosecuted for perjury or

23   rendering a false statement.  Despite that warning from

24   Your Honor, responding to questioning from Your Honor under

25   oath

1    Lemrick Nelson said in relation to his State murder trial

2    which was conducted in September and October of 1992, that "he

3    told Arthur Lewis that he had stabbed Yankel Rosenbaum."

4    Excuse me.

5              THE COURT:  Take your time. If you wish to take a few

6    moments, by all means, compose yourself.  You can do that.  Do

7    you want to    take a moment?

8              MRS. FAY ROSENBAUM:  Yes, just a minute.

9              (Pause in the proceeding)

10              Regarding Mr. Trevor Headley who, together with

11    Ms. Christine Yaris, represented him at the first civil rights

12    trial early 1997, in response to your direct question

13    "You are telling me now under oath that you told Mr. Headley

14    that you did stab Yankel Rosenbaum?"  Lemrick Nelson replied,

15    "Yes, Your Honor, before the trial he asked me whether or not

16    I stabbed him, I said yes."

17              Yet, Your Honor, on March the 31, 1998, more than a

18    year after Lemrick Nelson maintains he admitted stabbing

19    Yankel to Mr. Headley, and over six years after Nelson says he

20    had likewise admitted stabbing Yankel to the late

21    Arthur Lewis, the lawyer who had defended him at the State

22    murder trial in 1992, at his sentencing before Judge Trager,

23    on the 31st of March 1998, after having been asked by His

24    Honor whether he had anything he wanted to say, he turned to

25    me as I sat in the public gallery of the court next to my

1   husband and son and said:

2          "Mrs. Rosenbaum, I sympathize with you for the loss

3   of your son, but I didn't have no actions.  I had no part in

4   it.  Even though I have been found guilty of this crime, I'm

5   like a scapegoat."

6          That was a lie. All lies.  Lemrick Nelson by his very

7   own admission did stab Yankel.  His actions resulted in the

8   cold blooded murder of my son.  Lemrick Nelson amongst the mob

9   who violently attacked Yankel as you heard in evidence, to you

10  the call of "There's a Jew, get the Jew, kill the Jew" played

11  the principal part.

12         As for Nelson's expression of sympathy, just another

13  lie. Then, as now, Lemrick Nelson has not and has never been a

14  scapegoat. Far from it.  He's a vicious and callous racist

15  murderer, whose contempt for the law, the justice system and

16  indeed, for you, Your Honor, not to mention Yankel and our

17  family, knows no bounds, as neither does his criminality,

18  which is amply demonstrated by the lies he tells whether or

19  not under oath.

20         I, together with my husband and family, look forward

21  to Your Honor's recommendation that Lemrick Nelson be

22  prosecuted for perjury or rendering a false statement for the

23  lies he told you under oath.

24         I note from the transcript of the proceedings of the

25  next day after Nelson had told those lies to Your Honor, that

1    his counsel, Mr. Neuman, told you that Mr. Headley had told

2    him that he had learned that Nelson had admitted the stabbing

3    of Yankel to at least his mother.  How ironic.  How pathetic,

4    for it was his mother who came to me in the court immediately

5    after Judge Trager had passed sentence 31 March 1998, and in

6    front of my family and friends vehemently protested her son's

7    complete and absolute innocence of any wrongdoing.

8              I have no doubt Lemrick Nelson will be paraded before

9    you today and lauded by his lawyers as a changed person -- not

10   the 16 year-old teenager who wielded a knife emblazoned with

11   the word "killer" stabbed my and murdered my son Yankel.

12   Changed, maybe, but only for the worse, as his lies as the 27

13   and a half year-old clearly bears testimony to.

14             Yankel's loss is forever with me and my husband, and

15   indeed, all of those who loved Yankel.  Gone is his infectious

16   sense of humor, his sense of fun, his good nature and placid

17   disposition.  There is a profound everlasting numbness about

18   it all, an unreal feeling, totally unnatural, which has only

19   increased over time.

20             Deaths through accidents and illness are,

21   unfortunately, part of life and have always been so, although

22   I doubt that makes the loss of a child any easier to cope

23   with.  The murdering of Yankel, the consummate innocent

24   victim, cannot be reconciled.

25             Children eulogize parents, not the other way around.

1   It is not right.  It will never be right and it can never be

2   right. Time simply does not heal. There is no such thing as

3   closure. There never can be. Yankel's loss will remain

4   forever.

5           Yankel is missed in some different ways by all those

6   who knew him.  His many contributions, large and small, public

7   and private are no longer, and have not been replaced.

8           It is, however, the things that are more often taken

9   for granted which are constant reminders of Yankel's murder

10  and the loss it has brought. His place at the Shabbos table

11  remains empty when the family assembles for Pesach, Passover,

12  and the New Year Yankel is not there.

13          The academic work he commenced that brought him to

14  New York, today remains unfinished only because the underlying

15  theory and research was Yankel's own original work. His

16  friends talk about the void his murder created, which remains

17  in all our lives.

18          We do have memories, good memories of Yankel, but

19  they are too few by virtue only of the shortness of his life,

20  a good and productive life, cut down ever so tragically by

21  Lemrick Nelson who lacked the very qualities of character and

22  honesty which he destroyed.

23          There has been no apology from Lemrick Nelson for

24  Yankel's murder.  No remorse.  Nothing.  Just lies.  There is

25  nothing Lemrick Nelson can ever say that could ever be of any

1   comfort to me or my family.  He has shown himself to be a

2   pathological liar of criminal proportions.

3        Nelson's actions have taken Yankel away, away from

4   his family, friends and society.  While Nelson's family and

5   friends will always be able to visit him and be with him

6   irrespective of the sentence passed. My husband and I,

7   Yankel's family and friends, are left with only to visit a

8   grave.

9        My husband and I had our lawyers submit to you a

10  legal brief detailing why it is we believe that you have the

11  authority to imprison Nelson for life.  We read closely your

12  comments in response to questions received from the jury

13  during their deliberations describing them as being muddled,

14  confused and a little bit out of touch with their

15  responsibilities in terms of following your instructions on

16  the law.  Comments I believe that are even more befitting

17  their answer to the question posed on the verdict sheet after

18  they had found Nelson guilty of the charge of the indictment,

19  which included that the death of Yankel Rosenbaum did result

20  from Nelson's actions.  The jury had ignored evidence and not

21  acted in accordance with their oaths and certainly not in

22  accordance with your instructions and directions.  The report

23  in the New York Times have comments of the jury forewoman

24  referred to in the papers submitted to you by the government

25  only confirmed what was already patently obviously.

1        How disturbing that according to the papers lodged by

2    the defense lawyers this jury forewoman contacted them on two

3    occasions, but according to my inquiries, never demanded a

4    retraction from the New York Times, who stand by the complete

5    accuracy of that report, nor did she contact the government.

6    For that matter, I cannot understand why she did not contact

7    you, or did she?  I am not expecting an answer from you,

8    Your Honor.

9        Sometimes juries, as this one, as far as the answer

10   to their question on the verdict sheet after finding Nelson

11   guilty is concerned, fail the justice system and the victims

12   of crime.  I am not a lawyer, nor is my husband, but the legal

13   brief filed with you on our behalf sincerely places before you

14   in legal terms what we as lay people recognize from our

15   reading of the verdict sheet and the charge in the indictment.

16   My husband and I implore you to adopt that detailed in the

17   brief.  Do not let this misguided

18   jury undermine you, the court, and true justice in this case.

19       Once again, I thank you, Your Honor, for this

20   opportunity to speak here today. My husband and I and our

21   family trust you impose a sentence on Lemrick Nelson which

22   represents true justice reflecting the enormity of his crime

23   and ensuring that a clear unequivocal message is sent.  The

24   justice system will not tolerate crimes of the nature

25   committed on Yankel which ended his life nor will it stand

1    idle to be misused and abused.

2         THE COURT:  Thank you, Mrs. Rosenbaum.  We will stand

3    in recess for five minutes and then I will hear from

4    Mr. Nelson.

5         Thank you, for your thoughts.

6         (Court recessed.)

7         (Court resumed.)

8         THE COURT: Do you want to comment before we call upon

9    Mr. Nelson, Ms. Resnick?

10        MS. RESNICK:  Yes.  Briefly, Your Honor, the

11   government requests that the Court, most respectfully, impose

12   a statutory maximum in this case permissible under the law.

13   Based on the jury's verdict, the defendant in this case

14   attacked and brutally killed a completely innocent man, a man

15   that he knew to be innocent simply because Yankel Rosenbaum

16   was an Orthodox Jew. Now, as you have just heard, the

17   Rosenbaum family has suffered a tragic and irreversible loss.

18   This is a crime and Your Honor has received submissions to

19   this effect that created victims throughout this city. Because

20   hate crimes victimize all the members of the targeted group

21   and the particularly random and brutal way that

22   Yankel Rosenbaum was attacked by this defendant and others in

23   this case left a lasting impact on the Orthodox Jewish

24   community in this city. I don't know what the defendant may

25   say to the Court now but he is far from a changed man, from

1   the man he was when he took his knife and plunged it into

2   Yankel Rosenbaum, taking his life.  This is a defendant who

3   has continued over the last 12 years to perpetrate his lies as

4   recently, as Your Honor has found and confirmed here today, at

5   the last trial just a few months ago, in the 12 years since he

6   committed this crime this defendant has been lying to courts,

7   he has lied to juries and he has lied to the mother of his

8   victim. He has tried to avoid responsibility for his crime by

9   defaming the police officers who participated in his arrest

10  and investigation by defaming his prior attorneys, one of whom

11  is now deceased, and many others along the way. Despite

12  whatever the defendants says to the Court here today, he has

13  shown an utter lack of remorse and a smug sense of

14  indignation, despite the fact that

15  Yankel Rosenbaum, a young man, died of wounds inflicted by his

16  hand.

17         As Your Honor know from submissions from the

18  presentence report and the government submissions, this is the

19  defendant who in the time that he has been incarcerated since

20  the commission of this crime, has continued to commit crimes

21  of violence and possess knives and similar weapons on similar

22  occasions, since the commission of this repugnant crime.  For

23  all these reasons and considering the statement -- the victim

24  impact statement and the facts and evidence that came before

25  Your Honor, we ask you to upwardly depart based upon the death

1   of Yankel Rosenbaum and impose the statutory maximum in this

2   case.

3          THE COURT:  All right. Anybody else wish to say

4   anything before I call upon Mr. Nelson?  Mr. Nelson, now you

5   have the right to speak before sentence is imposed.  You,

6   obviously, have heard everybody speak here and you know what

7   my thoughts are to some extent in terms of upward departure

8   situation and the type of sentence that I think perhaps would

9   be useful to you as well as accomplish the type of sentencing.

10  Without saying anything more, this is your opportunity to

11  speak if you choose to do so.

12         THE DEFENDANT:  Well, first to the Rosenbaum family,

13  I like to apologize for my participation on the attack of

14  Yankel Rosenbaum August 19.  I was a 19 year-old  -- I mean a

15  16 year-old who made a terrible mistake which eventually led

16  to the unfortunate, untimely and needless death of an innocent

17  and harmless man. I know there is no excuse for what I did to

18  Mr. Rosenbaum. If there is anything I can or if there is

19  anything I could do to bring his life back, believe me, I

20  would do it in a heart beat.  I would never expect their

21  forgiveness. I know there is nothing I can do or say to

22  relieve the pain I have inflicted.  It may be hard for you to

23  believe this after all that has transpired in the past decade,

24  but I give you my deepest and sincerest apologies for putting

25  you through these litigation and the attack on your beloved

1    Yankel.

2              Second, I want to appeal just to my family for the

3    stress and pain and disappointment I have put them through.

4    My family has brought me up in a way that should never --

5    should never have resulted in my actions on August 19.

6              Finally, Your Honor, during my incarceration I have

7    learned to appreciate a lot of things in life which may be

8    beneficial to me and help me become a better life than the

9    life I was living in the past. I am 28 year-old man who has

10   been give plenty of time to think about what has happened to

11   Yankel Rosenbaum.  Now I'd like to move on with my life and

12   put the past behind me, for the only thing I may use is the

13   lesson I learned from my mistakes that helps me become a

14   better man instead of a belligerent young man.  In doing so, I

15   want Your Honor to know that there is not a day that goes by

16   that don't think and I remember that Mr. Rosenbaum lost his

17   life unnecessarily and I realize that is something that I have

18   to carry with me for the rest of my life.

19             THE COURT:  All right.  Mr. Nelson, first, on the

20   issue of upward departure, the Court will upwardly depart.  I

21   suspect that does not come as a surprise to you and your

22   counsel, since I have put everybody on notice before and I

23   have articulated my concerns I think clearly enough, but

24   specifically, in terms of law that I am obliged by my oath of

25   office to comply with. Whether I may or may not agree with it,

1    I am bound to comply with the law.

2          There is a maximum of ten years that I am constrained

3    to address in terms of the upward departure but I will

4    upwardly depart to the maximum. I find in the exercise of this

5    sentencing that the role -- that your actions on August 19th,

6    1991 did result in Yankel Rosenbaum's death.

7          That is, as I told the jury, I now find that the

8    death was an actual and foreseeable consequence of the acts

9    committed by you. I make this determination not simply by the

10   preponderance of the evidence. I think that would trivialize

11   the seriousness of what occurred on that night, but by clear

12   and convincing evidence.

13         The verdict of this jury was the same as the verdict

14   before Judge Trager in terms of the determination by the jury

15   that you committed the crime of the violation of

16   Mr. Rosenbaum's civil rights. What was different, of course,

17   is that the cause of the intervening decision of the United

18   States Supreme Court in the case, Apprendi versus the United

19   States, the issue of whether death resulted was no longer a

20   matter left to the discretion and the determination of the

21   sentencing judge.  We respect the decision of the United

22   States Supreme Court, obviously, and because of that, the jury

23   had to make the determination.  Here the jury has made its

24   determinations.  I now make my determinations in terms of the

25   parameters of sentencing and based upon everything I have

1    heard and everything I know about this case, this represents a

2    modest upward departure. If allowed, I would have undoubtedly

3    departed more so. Let me also say that, regardless of

4    obstruction of justice, and you know how I have come to rest

5    with the so-called McKeon hearing, even if there were no

6    so-called adjustment, I would, nonetheless, have upwardly

7    departed, having made the finding that death resulted as a

8    result of your acts, to the maximum of ten years. As I

9    mentioned to Mr. Quijano, upward departure is clearly

10   indicated here because all we have to go on based upon the

11   jury's verdict is the aggravated assault which simply does not

12   factor in the death of the victim.  I want to be clear about

13   that legally in terms of trying to explain to you as best as I

14   can the rationality and reasons for the Court's sentence.

15          Now we come to the issue of what kind of conditions

16   to impose upon you with respect to supervised release.  I am

17   going to impose three years of supervised release.  That is

18   the maximum that I can impose under the law, just like ten

19   years or 120 months of incarceration is the maximum I can

20   impose under the law.  But it is important now that we address

21   your future life, because you have a future life, unlike

22   Mr. Rosenbaum, and it is important for society to have as much

23   comfort as possible that when you return to society, that you

24   be able to live in harmony and peace with society as well as

25   with yourself and hopefully, you will be able to do some good

1    deeds and I really have no idea of how that will work out.

2    That's something that's really personal to you.

3            But nonetheless, the following conditions of

4    supervised release will be imposed by me:

5            First, the obvious of course is that you will not

6    possess any weapons, including knives, razors, box cutters, or

7    any sharp edged weapons.  In that respect, I am aware of the

8    problem you had down in Georgia after the jury found you not

9    guilty on the state charge and you know what I'm talking

10   about, so you just cannot do that. If you violate any of these

11   conditions of supervised release, I am sure your lawyers have

12   told you, if not I will say this again, that you will be

13   subject to a violation proceeding and certainly you will be

14   exposing yourself to additional periods of incarceration.

15           I think the law requires a maximum of two years if

16   that happens, but we are not dealing with that right now.

17           MS. RESNICK:  I believe it is three years.

18           THE COURT: It is three years.  You can be sentenced

19   to three years.

20           MS. RESNICK:  It is a three-year period of supervised

21   release.

22           THE COURT: It may be two years, it may be three

23   years, but we are not dealing with that here.  It is important

24   that Mr. Nelson realize that he could face additional

25   incarceration for violation of these conditions of supervised

1    release which I am imposing. There will be also a condition

2    for you to be provided with mental health treatment because

3    that's going to aid you in your rehabilitation. I think you

4    need that type of help. Your criminal history, including the

5    instant offense, indicates that you are prone to becoming

6    angry and volatile and when in such a state you can be

7    physically dangerous to those around you, and once again, I am

8    talking about what happened down in Georgia. Clearly, I

9    believe you need help with this problem so, therefore, while

10   under supervision you will participate in the mental health

11   treatment program or programs. The treatment provided will be

12   selected by the probation officer in charge of your probation

13   supervision and such treatment can include inpatient as well

14   as outpatient.

15           You will pay the costs of that if you are financially

16   able to do so and that is something which we cannot determine

17   at the present time.

18           I am not going to fine you because you don't have the

19   ability to pay a fine even though I think that there is a

20   hopeful possibility that you will be employable in the future,

21   but I don't see any wherewithal in the near future for you to

22   be able to pay any fine.

23           There is a a $50 special assessment that is required

24   by law, and I am also going to impose as an additional

25   condition of supervised release a search condition as follows:

1   That you shall submit your personal residence, place of

2   business, vehicle or any other premises under your control, to

3   a search, on the basis if the probation officer has reasonable

4   belief that contraband or a violation of the conditions of the

5   release may be found.  The search must also be conducted in a

6   reasonable manner and at a reasonable time.  Failure to submit

7   to a search may be grounds for revocation, and you are to

8   inform any residents that the premises may be subject to

9   search pursuant to this condition.

10          I'm also going to provide as a condition of

11  supervised release, in addition to the prohibition against the

12  weapons that I described, prohibition for the possession of a

13  firearm, and an additional condition of supervised release

14  will prohibit you from partaking of any illicit drugs, and I

15  would say alcohol as well, since you have told the Court that

16  you are inclined to drink and that was, of course, part of

17  your defense, that you were inebriated or how your ability to

18  understand what was happening was impaired because of the

19  heavy consumption of alcohol.

20          The last condition of special conditions of

21  supervised release will be, as I have explained to

22  Mr. Quijano, a period of nine months in community confinement

23  center -- we call that a halfway house also or a comparable

24  facility -- and in that respect I just want to inform the

25  lawyers and everybody about the legal aspects, so that you

```
 1   will have a clear understanding that I have carefully
 2   considered whether I have the authority under law that I can
 3   do that.  I am satisfied I do have the authority. I think nine
 4   months is an appropriate period of time for you to be in
 5   community confinement. You should be given sufficient time to
 6   seek employment and to ultimately maintain gainful employment.
 7   I recommend, though it is up to the Bureau of Prisons to
 8   implement my recommendation, that you be placed in the
 9   comprehensive sanction center in Newark, New Jersey which has,
10   as I have explained, the most comprehensive and intensive
11   service to help rehabilitate offenders.
12           In making this determination I have already explained
13   to you why I think for rehabilitation purposes this is
14   separate and apart from imprisonment.  This has nothing to do
15   with the ten-year maximum, but under the law, specifically
16   section 5F1.1 of the sentencing guidelines, it provides that
17   community confinement may be imposed as a condition of
18   probation or supervised release.  That contrasts with section
19   5F1.2 dealing with home detention, which provides that home
20   detention may be imposed as a condition of probation or
21   supervised release, but only as a substitute for imprisonment.
22           I have carefully considered whether I have the
23   authority since dealing with a ten-year maximum to impose this
24   condition of supervised release for the purposes of
25   benefitting you with rehabilitation and I am satisfied I do.
```

1    There are two cases which I will advise you of right now which

2    I rely upon, the Ninth Circuit decision in the year 2000 U.S.

3    versus Bahe 201 F.3d 1120, and then there is a Seventh Circuit

4    decision which clearly addresses the issue of whether

5    supervised release can accommodate a community confinement

6    scenario, notwithstanding the fact that you are dealing with a

7    maximum period of incarceration, and the Seventh Circuit in

8    Elkins answers that question in the affirmative.  The Second

9    Circuit has not spoken on the issue but I think it is clearly

10   indicated here. The Seventh Circuit citation is 176 F.3d 1016.

11   I hope you will take advantage of the opportunity that I am

12   providing for you to have this period of rehabilitation, and

13   these people are capable of getting you employment or

14   assisting you. You will have the opportunity to show to the

15   people who run the community center that you really, truly are

16   bent on rehabilitating yourself, that you truly are bent on

17   getting proper employment and making your best efforts to put

18   your money, so to speak, where your mouth is.  So this is an

19   opportunity for you and I think that is a proper sentence.

20        I think that pretty much concludes everything except

21   that we have general conditions of supervised release which

22   Mr. Innelli is handing you.  Read them.  You must comply with

23   them also. There are fourteen of them and if you fail to

24   comply with those general conditions, as if you would fail to

25   comply with a special condition, well, then, you will have to

1    be mindful of the fact that you can be cited for violation of

2    the conditions of supervised release and you will have to come

3    before me or some other judge if I am not available and answer

4    to the Court.  As I have told you, you can be subject to

5    additional periods of incarceration.

6            Now, the sentence I have imposed upon you satisfies

7    at least two of the bases for sentencing set forth in our law.

8    I find that it is appropriate to reflect the seriousness of

9    the offense, to promote respect for the law, and to provide

10   just punishment for the offense, and also, to provide you with

11   necessary rehabilitation.

12           If your attorney wants to make a comment now?

13           MR. QUIJANO:  Your Honor, in the Court's earlier

14   comments when it was discussing community confinement, it

15   referred to a period of time, about six months, and indeed,

16   that is consistent with application note 2 of 5F1.1 which

17   suggested generally should not impose a period in excess of

18   six months.

19           THE COURT:  Mr. Quijano, I would think that you would

20   be happy with the fact that the Court is imposing nine months

21   to give him an added opportunity to get the needed structure

22   and rehabilitation that he needs.  We are speaking

23   rehabilitation, we are not speaking punishment.

24           MR. QUIJANO:  Which obviously I am in total support.

25   However, as I stated before, I don't think this is the kind of

1    structure which is necessary. Therefore, I would ask that the

2    Court impose what is recommended in 5F1.

3            THE COURT: I have considered that but I think nine

4    months is more appropriate.  Look, arguably if I wanted to be

5    punitive I could say a year, a year and a half.  I am not

6    doing that.

7            MR. QUIJANO:  We are not suggesting that the Court

8    is.

9            THE COURT:  I just want you to be aware that I have

10   painfully examined what the facilities are all about and

11   painfully considered what a proper rehabilitation period is.

12   Sometimes people view community confinement as the equivalent

13   of punishment.  It is not designed to do that.  It is designed

14   for rehabilitation.  Your client, Mr. Nelson, is sorely in

15   need of every opportunity we can provide to help him

16   rehabilitate himself.  In my opinion that condition includes

17   the sentence.

18           First I want to advise you, as I am obliged to under

19   the law, as to your right to appeal.  The attorneys are well

20   skilled, outstanding members of the bar and they know.  You

21   will have to file a notice of appeal within ten days from the

22   date that I enter judgment from that period of time. There

23   will be a written judgment from that period of time, and they

24   will be able to perfect it thereafter, if they choose to

25   appeal.  They will advise you of all of your appellate rights.

1          Now, I want to conclude the sentence. I have thought

2   for days and days and days what, if anything, I should say.  I

3   knew I had to say a lot in order to get to the sentence, which

4   I have just announced, and I went back and forth should I say

5   anything else, should I not say anything else, but last night

6   something came to me which I thought, hopefully, will be

7   useful to everybody, and then I saw today in the newspaper

8   that the Rosenbaum and the Cato family got together and I was

9   heartened to see that.

10         So we grieve the loss of Gavin Cato and

11  Yankel Rosenbaum on the twelfth anniversary of their deaths.

12  One was caused by an accident and the other by horrendous and

13  pathetic acts --  I emphasize the word acts -- of religious

14  and racial bigotry which have no place in any sane society.

15  Regardless, each death represents a tragic loss to their

16  respective families.  Recognizing this, they have come

17  together and have shared in each other's pain and grief. By

18  their example, they have given us all hope that some day

19  prejudice and hatred because of one's religion or the color of

20  one's skin will be no more; and neither Gavin nor Yankel will

21  have died in vain.

22         That concludes the Court's sentence.

23         MR. QUIJANO:  Thank you.

24         MS. RESNICK:  Thank you, Judge.

25         (Proceedings concluded as above set forth.)

1                    *   *   *   *   *   *   *   *

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25